Michael A. Gehret (Nevada Bar No. 9307)
D. Loren Washburn (Nevada Bar No. 14297)
ARMSTRONG TEASDALE LLP
201 South Main Street, Suite 750
Salt Lake City, UT 84111
Tel. (801) 401-1607
mgehret@atllp.com
lwashburn@atllp.com

Brandon P. Johansson (Nevada Bar No. 12003)
ARMSTRONG TEASDALE LLP
3770 Howard Hughes Parkway, Suite 200
Las Vegas, NV 89169
Tel. (702) 678-5070
bjohansson@atllp.com

*Attorneys for Catalystix Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| CATALYSTIX INC., a Nevada corporation,<br><br>Plaintiff,<br><br>v.<br><br>LEGACY CREATIVE INC., an Alberta corporation, and ANDREA REINDL MCLEAN, an individual,<br><br>Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiff CATALYSTIX INC. ("Catalystix" or "Plaintiff") hereby complains and alleges that Defendants LEGACY CREATIVE INC. ("Legacy Creative") and ANDREA REINDL MCLEAN ("Ms. McLean") (collectively, "Defendants") breached a contract between Catalystix and Legacy Creative, causing Catalystix significant damages. Catalystix further complains and alleges that Ms. McLean: (i) converted Catalystix funds; (ii) tortiously interfered with a prospective contractual relationship between Catalystix and a third party; (iii) negligently managed the website of one of Catalystix's sub-brands; and (iv) unjustly enriched herself at Catalystix's expense. Catalystix specifically alleges as follows:

1

**PARTIES**

1. Plaintiff Catalystix is a corporation organized and existing under the laws of the State of Nevada with its headquarters and principal place of business in Las Vegas, Nevada.

2. Defendant Legacy Creative is a corporation organized and existing under the laws of the Province of Alberta with its headquarters and principal place of business in Calgary, Alberta, Canada.

3. Defendant McLean is an individual residing in the Province of Alberta, City of Calgary. Ms. McLean is the founder, CEO, and sole owner of Legacy Creative.

**JURISDICTION AND VENUE**

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because complete diversity exits between the parties and because the amount in controversy exceeds $75,000.

5. This Court has personal jurisdiction over Legacy Creative because, on information and belief, Legacy Creative is a successor company of Smarter Voice, Inc. ("Smarter Voice"), a Nevada corporation owned and wholly operated by Ms. McLean and her ex-husband before it was dissolved. Smarter Voice purposely availed itself of the privilege of conducting activities within Nevada, directed its conduct at persons in Nevada, and, on information and belief, regularly did business in Nevada. The company dissolved in 2016 and, according to Plaintiff's investigation, transferred all its clients and at least some of its employees to Legacy Creative. The facts giving rise to the claims in this Complaint stem from the relationship and business arrangement originally begun by Smarter Voice and continued by Legacy Creative with one of those clients (i.e., Catalystix).

6. This Court has personal jurisdiction over Ms. McLean because Ms. McLean partially owned Smarter Voice, a Nevada corporation dissolved in 2016 that, on information and belief, regularly did business within the state. According to Plaintiff's investigation, upon Smarter Voice's dissolution, Ms. McLean transferred all the clients and at least some of the employees from the dissolved Nevada company to Legacy Creative. The facts giving rise to the claims in this Complaint stem from the relationship and business arrangement originally begun by Smarter Voice and continued by Legacy Creative with one of those clients (i.e., Catalystix).

7. Ms. McLean is the sole owner of Legacy Creative. At all times relevant to the allegations and causes of action outlined in this Complaint, Ms. McLean exercised complete dominion and control over Legacy Creative, as if it was an extension of her personal self. There is no functional separation between Ms. McLean and Legacy Creative.

8. Venue is proper in this jurisdiction pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Catalystix's claims occurred in this judicial district.

## FACTUAL ALLEGATIONS

### Catalystix and Legacy Creative Form a Business Arrangement

9. Catalystix is wholly owned and operated by Eric Edmeades. The company offers a variety of products and services under various sub-brands, including WildFit, Speaker Nation, Business Freedom, Azaya, and Eric Edmeades (the "Sub-brands").

10. WildFit is a health and wellness brand aimed at helping people improve their relationships with food through online and in-person courses and coaching sessions.

11. Business Freedom is a business training brand that offers programs and live events on strategies for building successful businesses.

12. Speaker Nation is a masterclass aimed at helping people become better public speakers and more effective communicators.

13. Azaya is a personal development brand that focuses on helping clients become better communicators through digital events, live events, and membership programs.

14. Eric Edmeades is a personal brand that focuses on establishing Mr. Edmeades as a keynote speaker and an authority on personal and financial wellbeing.

15. In 2015, Catalystix engaged Smarter Voice to provide marketing and back-office services for the Sub-brands, as well as the events and programs associated with the Sub-brands. At the time, Smarter Voice was a Nevada corporation that was owned and wholly operated by Ms. McLean and her ex-husband.

16. Eventually, Smarter Voice began to transfer its operations and agency responsibilities to Ms. McLean's newly founded company, Legacy Creative. According to its website, Legacy

3

Creative is an agency set up to take the business ideas of its clients and turn them into realities. *See* https://legacycreative.com/about/.

17. In 2016, Smarter Voice dissolved when Ms. McLean and her ex-husband divorced. Plaintiff's investigation has uncovered that as part of the divorce, Ms. McLean took the clientele of Smarter Voice and her ex-husband took the company's other assets.

18. On information and belief, Ms. McLean transferred all Smarter Voice's clients (one of which was Catalystix) to Legacy Creative. Some of the employees of Smarter Voice were also employees of Legacy Creative or became employees of Legacy Creative after Smarter Voice dissolved. After the dissolution, Legacy Creative continued to provide services to Catalystix that Catalystix had originally sought from Smarter Voice.

**Catalystix and Legacy Creative Agree to Modify Their Business Arrangement**

19. At the beginning of their business relationship, the parties agreed that the agent (first Smarter Voice and then Legacy Creative) would bill Catalystix for the agent's services and the expenses associated with conducting events on behalf of Catalystix and the Sub-brands. Per industry standard, the parties also agreed that Catalystix would pay for and own any intellectual property developed in relation to the operation of the Sub-brands.

20. The parties continued in this arrangement for almost five years. As time went on, however, Catalystix became concerned that Legacy Creative was violating the arrangement by overbilling Catalystix for services and expenses associated with the events.

21. Accordingly, in mid-2020, Catalystix approached Legacy Creative, and the parties agreed to modify their arrangement. Specifically, on or about July 20, 2020, the parties entered a Letter of Intent ("LOI") and agreed that Legacy Creative would take over the management and representation of the Sub-brands. The LOI is attached hereto as **Exhibit 1**. Legacy Creative would be an authorized marketing and distribution representative of the in-person events, online services, and products associated with the Sub-brands, and would perform these services for the benefit of Catalystix and according to Catalystix's instructions.

22. The parties also agreed that rather than bill Catalystix for its time and expenses associated with the events, Legacy Creative would collect client payments for the events and then

use those funds to staff and conduct the events. Costs associated with the events included, without limitation, paying the coaches and instructors to lead the events, creating sales content and materials, and paying commissions owed to other affiliated parties.

23. The LOI further provided that Legacy Creative would maintain and manage the accounts and websites of the Sub-brands—including their social media, financial, and marketing accounts—for the benefit of Catalystix and the Sub-brands.

24. The LOI further provided that "all the [i]ntellectual property and associated assets related to" the Sub-brands—including without limitation event syntax, artwork for the Sub-brands (e.g., logos and templates), and client materials for events (e.g., brochures, slide decks, and presentations)—belonged to Catalystix and Mr. Edmeades.

25. By way of payment, the LOI provided that Catalystix and Mr. Edmeades would receive royalties for sales Legacy Creative generated from managing the Sub-brands. Specifically, Catalystix and Mr. Edmeades would receive:

   a. 15% of the sales generated by Legacy Creative under the WildFit sub-brand;
   b. 10% of gross sales generated by Legacy Creative on digital products and live events under the Speaker Nation sub-brand;
   c. 10% of gross sales on all events and digital programs generated by Legacy Creative under the Azaya sub-brand;
   d. 60% of fees for speaking engagements under new contracts and 80% of fees for speaking engagements under repeat contracts (or contracts generated by Mr. Edmeades) under the Eric Edmeades personal brand; and
   e. 10% of the gross sales generated by Legacy Creative on digital products, digital live events, and live mastermind events under the Business Freedom sub-brand.

26. The parties also agreed that Legacy Creative would keep the profits generated from the in-person and online events after paying all royalties and costs associated with the events.

27. Pursuant to the LOI, Legacy Creative was to provide the services outlined above beginning in July 2020 and continuing as long as the relationship remained mutually beneficial to

both parties. If either party desired to opt out of the arrangement, the parties agreed to seek a reasonable and fair separation agreement.

28. The LOI and the parties' understanding and agreement regarding their new arrangement is referred to hereafter as "the Contract."

### The Parties Continue Their Business Relationship Under the Contract for Approximately 10 Months

29. For approximately 10 months following the LOI, the parties carried out their obligations according to the new arrangement described in Paragraphs 21-28.

30. Specifically, from July 2020 to approximately May 2021, Legacy Creative organized and distributed around eight online events, as well as an ongoing WildFit program, on behalf of Catalystix. In each instance, Legacy Creative collected the client funds and paid all expenses associated with putting on these events.

31. Legacy Creative did not, however, pay royalties to Catalystix and Mr. Edmeades associated with these events as obligated under the Contract. Nevertheless, in several oral and written communications surrounding the events, Legacy Creative (through Ms. McLean) acknowledged that these royalties were owed to Catalystix and Mr. Edmeades and promised to pay them.

### Legacy Creative Breaches the Contract and Defendants Engage in a Campaign of Extortion Against Catalystix

32. In May 2021, Legacy Creative breached the Contract and engaged in a campaign of extortion against Catalystix and Mr. Edmeades.

33. Specifically, after the parties agreed to part ways, Ms. McLean sent Mr. Edmeades an email/letter (the "May 2021 Letter"), attached hereto as **Exhibit 2**.

34. In the email, Ms. Mclean made several demands that fell outside the agreed-upon terms in the Contract. She also made illusory concessions and refused to grant Catalystix access to its accounts and intellectual property unless Catalystix met her demands. Specifically, the letter included:

    a.   A demand that Catalystix release "any rights" to funds Legacy Creative gathered through the end of June 2021, including those gathered from clients for events that had not yet taken place and a WildFit coaching program that was only a third of the way complete;

    b.   An agreement that Catalystix would maintain ownership of all intellectual property "directly related to the brands"; and

    c.   A demand that Catalystix would deliver the upcoming events and programs "with no further involvement from Legacy Creative."

35. At the end of the letter, Ms. McLean wrote:

> If we can come to terms and an agreement drafted by my lawyer by the end of the week we can all proceed with our respective lives and business. Allowing you to move forward and me to do the same with no further claim to the work we've created together and avoided [*sic*] a messy battle.

36. In other words, after already collecting funds from Catalystix's clients for future events and ongoing programs, Ms. McLean insisted that Legacy Creative would keep the funds and leave the burden and cost of hosting the events to Catalystix. This was a breach of the Contract in that Legacy Creative had not paid the royalties or expenses associated with these events before remitting the client funds to itself.

37. Catalystix demanded several times that Defendants cease communication with its clients and return the funds associated with these events and programs. But Defendants refused. As a result, Catalystix was forced to cancel several upcoming events in August, September, and November of this year. Moreover, because the WildFit coaching program had already begun, Catalystix was forced to complete the program using its other resources instead of funds paid by the program participants.

38. Also, in May 2021, Catalystix became aware that Legacy Creative, under Ms. McLean's control and direction, had changed the passwords and recovery emails associated with the Sub-brands' social media, financial, and marketing accounts. Even though Legacy Creative was

7

obligated to maintain these accounts under the Contract (*see* Ex. 1 at 6), changing the passwords and recovery emails was contrary to Catalystix's instructions and industry practice.

39. Because of Defendants' actions, Catalystix was effectively locked out of the Sub-brands' accounts. Catalystix demanded several times that Defendants comply with its instructions and provide access to the accounts.

40. Along with denying Catalystix access to its accounts, Defendants also denied Catalystix access to some of its intellectual property. This intellectual property included without limitation event syntax, artwork for the Sub-brands (e.g., logos and templates), and client materials for events (e.g., brochures, slide decks, and presentations). Defendants claimed that many of these items belonged to Legacy Creative, despite language in the LOI (*see* Ex. 1 at 6) and the May 2021 Letter (*see* Ex. 2 at 3) to the contrary.

41. Defendants represented that they would grant Catalystix access to the accounts and intellectual property when Defendants agreed to the demands in the May 2021 Letter. Since then, Defendants have granted Catalystix limited access to some of its accounts and intellectual property but not all of them.

42. For example, Defendants have granted Catalystix access to its Facebook ads account, and its Wistia account, but they have not relinquished the *management and control* of these accounts (e.g., the recovery emails), meaning that Defendants can use the accounts for their benefit and cut off Catalystix's access at any time. Catalystix's lack of control of its Facebook ads account alone is delaying crucial ad campaigns and costing the company thousands of dollars per week.

43. With regard to the intellectual property, Defendants have drip fed Catalystix individual assets instead of turning them over in the organized file structure in which they were stored. As such, it is difficult for Catalystix to know for certain which of its intellectual property remains in Defendants' possession and control.

**Defendants' Conduct Derails a Transaction Between Catalystix and MindValley**

44. At the time that Ms. McLean sent the May 2021 Letter, Catalystix was in negotiations to sell its brand (and sub-brands) to MindValley, Inc. ("MindValley") for $7.5 million (the "MindValley Transaction").

45. Prior to Catalystix entering these negotiations with MindValley, Defendants submitted an acquisition proposal to Catalystix to purchase the WildFit sub-brand. Catalystix turned down the proposal from Defendants because it did not have confidence in Defendants' ability to carry out the deal and grow the sub-brand. Shortly thereafter, Catalystix and MindValley began negotiating the purchase and sale of Catalystix's brand and sub-brands. On information and belief, Defendants were upset that Catalystix turned down their offer and instead agreed to sell the WildFit sub-brand to MindValley.

46. The MindValley Transaction had been reduced to writing and was undergoing final approval at MindValley when the current dispute between Catalystix and Defendants arose.

47. Defendants were aware of the MindValley Transaction, as well as MindValley's plans to make an initial public offering ("IPO"). On information and belief, Defendants also knew that MindValley would be reluctant to proceed with the MindValley Transaction if there were any adverse actions, business disruptions, or potential legal claims related to WildFit. Defendants used this knowledge to gain further leverage on Catalystix and attempt to force the company to accept their demands in the May 2021 Letter.

48. Specifically, in the May 2021 Letter, Ms. McLean wrote that Defendants' proposal was "a simpler solution that allows us to cut ties this week and releases you to complete your time-sensitive and lucrative deal with Mindvalley free of contractual obligations to Legacy Creative." (*See* Ex. 2 at 1.)

49. MindValley learned of Legacy Creative's breach of the Contract and Defendants' extortive demands in the May 2021 Letter. On information and belief, MindValley was concerned about the negative effect that Defendants' conduct would have on Catalystix and its sub-brands, as well as the effect that a potential legal dispute would have on MindValley's planned IPO.

50. Thus, on May 31, 2021, MindValley withdrew its offer to purchase Catalystix's brand for $7.5 million. MindValley's decision to withdraw from the MindValley Transaction was a direct result of Defendants' conduct and threats surrounding the May 2021 Letter.

**Legacy Creative's Mismanages WildFit's Website, Resulting in a Significant Data Leak**

51. As discussed above, Legacy Creative was responsible for maintaining several websites for the Sub-brands, including the website for WildFit. (*See* Ex. 1 at 6.)

52. Around the time of the May 2021 letter, Legacy Creative detached the shop.getwildfit subsite from the main web page, claiming that the subsite belonged to Legacy Creative. This action removed the Secure Sockets Layer ("SSL") Certificate, leaving all of WildFit's clients' personal information on the front end of the website.

53. As a result, Hackers were able to obtain this personal information—which included all of WildFit's clients' passwords— and leak it on the internet (the "Data Leak").

54. The Data Leak caused significant dissatisfaction from WildFit's clients and led to double charges on these clients' credit cards due to the separation of the sites.

**Defendants' Actions Cause Catalystix Significant Damages**

55. As a result of Legacy Creative's breach of the Contract, Defendants' extortive demands, and the Data Leak, Catalystix has suffered and will continue to suffer significant damages.

56. Defendants' refusal to turn over client funds collected through June 2021 forced Catalystix to cancel several upcoming events in August, September, and November of this year. These cancellations have damaged and will continue to damage the reputation of Catalystix and its sub-brands. Indeed, even if Catalystix gains access to the funds held by Defendants and is able to re-plan the events, it expects to lose two-thirds of its client participants given the events that have transpired thus far. Catalystix has also expended time and resources in trying to help its clients get refunds for the cancelled events directly from Legacy Creative. To this day, Legacy Creative is refusing to issue refunds for these canceled events.

57. Defendants' refusal to relinquish control of Catalystix's marketing, social media, and financial accounts has prevented Catalystix from running crucial ad campaigns, costing the company thousands of dollars per week. Moreover, Defendants' refusal to turn over all Catalystix's intellectual property—including event syntax, artwork, and presentation materials—has deprived Catalystix of the use and benefit of intellectual property for which it has paid at least one million dollars.

58. Legacy Creative's breach of the Contract and Defendants' extortive demands on Catalystix also caused Catalystix significant damage by derailing the MindValley Transaction. On information and belief, but for Defendants' conduct surrounding the May 2021 Letter, MindValley would have gone through with the MindValley Transaction and paid Catalystix $7.5 million for its brand and sub-brands. Instead, MindValley backed out of the sale, resulting in damages of at least $7.5 million to Catalystix.

59. Finally, the Data Leak has also caused Catalystix to suffer significant damages. Specifically, the Data Leak caused significant harm to Catalystix's brand and WildFit, as evidenced by numerous complaints on social media surrounding the Data Leak. It also resulted in double charges on the credit cards of Catalystix's clients, and Catalystix has had to expend time and resources to resolve these double-charges and maintain its client base.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT
### (Against Legacy Creative)

60. Catalystix realleges and incorporates Paragraphs 1-59 as if fully set forth herein.

61. The Contract is a valid contract between Catalystix and Legacy Creative. The parties intended to contract for a new business arrangement in mid-2020, they exchanged promises, and their general obligations are sufficiently clear. In particular, the parties' LOI, their understanding of and agreement to the post July-2020 arrangement, and their subsequent conduct is evidence of an implied-in-fact contract between them.

62. The Contract imposes certain duties and obligations on Legacy Creative.

63. Legacy Creative breached its contractual duties by, among other things, failing to turn over client funds for events that had not yet occurred, failing to give Catalystix control of its social media, financial, and marketing accounts, and failing to turn over intellectual property that belongs to Catalystix.

64. Catalystix does not have access to these funds, nor does it have control of all its accounts and intellectual property, to this day.

65. Catalystix has performed all obligations imposed on it under the Contract or has been excused from performance by Legacy Creative's breach of the Contract.

66. As a proximate result of Legacy Creative's actions, Catalystix has suffered damages (as alleged in Paragraphs 55-59) in an amount to be determined at trial, exclusive of costs and interest.

**SECOND CAUSE OF ACTION:**
**CONVERSION**
**(Against All Defendants)**

67. Catalystix realleges and incorporates Paragraphs 1-66 as if fully set forth herein.

68. Pursuant to the Contract, Catalystix allowed Legacy Creative to act as Catalystix's agent and collect payments from clients for online and in-person events under the Sub-brands. Catalystix also allowed Legacy Creative to manage the accounts and intellectual property related to the Sub-brands to facilitate the events and marketing of the brands.

69. Based on the Contract, however, Legacy Creative was obligated to pay royalties and expenses associated with the events before retaining profits from the events for itself. Moreover, the accounts and intellectual property associated with the operation of the Sub-brands were paid for and are owned by Catalystix.

70. As described herein, Defendants have unjustifiably retained the client funds for past and future events and refused to pay the costs associated with those events and the royalties due to Catalystix and Mr. Edmeades. Defendants have also refused to give Catalystix control of all accounts and possession of all intellectual property related to the operation of the Sub-brands.

71. Catalystix has demanded that Defendants turn over the funds, control of the accounts, and all intellectual property related to the operation of the Sub-brands.

72. Defendants have refused, thereby depriving Catalystix of its property and causing an actual and severe interference with Catalystix's right of possession of that property.

73. As a result of Defendants' actions, Catalystix has suffered damages (as alleged in Paragraphs 55-59) in an amount to be proven at trial, exclusive of costs and interest.

**THIRD CAUSE OF ACTION:**
**TORTIOUS INTERFERENCE WITH ECONOMIC ADVANTAGE**
(Against All Defendants)

74. Catalystix realleges and incorporates Paragraphs 1-73 as if fully set forth herein.

75. As alleged in Paragraphs 44-50, prior to May 31, 2021, a prospective contractual relationship existed between Catalystix and MindValley with regard to the MindValley Transaction.

76. Defendants were aware of this prospective relationship, as demonstrated by Ms. McLean's reference to the MindValley Transaction in the May 2021 Letter. (*See* Ex. 2 at 1.)

77. On information and belief, Defendants intended to harm Catalystix by damaging or preventing the contractual relationship between Catalystix and MindValley because Defendants were upset that Catalystix had not previously agreed to sell WildFit to them.

78. Defendants' intent to harm or prevent the Catalystix-MindValley contractual relationship is also demonstrated by Defendants' attempt in the May 2021 Letter to gain leverage over Catalystix and force it to comply with Defendants' extortive demands.

79. Defendants had no lawful privilege or justification to interfere with, harm, or damage Catalystix's prospective contractual relationship with MindValley.

80. As a result of Defendants' actions, Catalystix has suffered damages (as alleged in Paragraphs 55-59) in an amount to be proven at trial, exclusive of costs and interest.

**FOURTH CAUSE OF ACTION:**
**NEGLIGENCE**
(Against Legacy Creative)

81. Catalystix realleges and incorporates Paragraphs 1-80 as if fully set forth herein.

82. Prior to the parties' dispute, Legacy Creative was obligated to maintain and manage WildFit's website. As Catalystix's agent, Legacy Creative owed Catalystix a duty to exercise this obligation with reasonable care.

83. Legacy Creative breached that duty by detaching the shop.getwildfit subsite from WildFit's main web page, thereby removing the SSL Certificate from the page and allowing hackers to obtain the personal information of WildFit's clients. Those hackers then leaked that information—which included all of WildFit's clients' passwords—on the internet.

84. As an actual and proximate result of this Data Leak, WildFit's clients became dissatisfied, causing harm to Catalystix's brand and sub-brand (WildFit).

85. The Data Leak also led to double charges on these clients' credit cards, causing further harm to the Catalystix brand and WildFit sub-brand and forcing Catalystix to expend time and resources to resolve the double charges.

86. Catalystix has suffered damages from Legacy Creative's negligence in an amount to be proven at trial, exclusive of costs and interest.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

87. Pursuant to Rule 8(d), Catalystix brings this cause of action in the alternative to its First Cause of Action for Breach of Contract

88. Catalystix conferred a benefit upon Defendants when Catalystix allowed Legacy Creative to act as Catalystix's agent and collect payments from clients for online and in-person events under the Sub-brands.

89. Catalystix also conferred a benefit upon Defendants when Catalystix paid for the development of intellectual property related to the operation of the Sub-brands and allowed Legacy Creative to use that intellectual property to promote Catalystix and the Sub-brands.

90. Defendants knowingly accepted these benefits conferred upon them by Catalystix, as demonstrated by: (1) the May 2021 Letter informing Catalystix that Legacy Creative would be retaining the payments from clients through June 2021; and (2) Defendants refusal to turn over all intellectual property developed in relation to the operation of the Sub-brands.

91. Under all the circumstances described in Paragraphs 1-59, it would be inequitable for Defendants to retain these benefits conferred upon them by Catalystix (i.e., payments from clients and intellectual property) without Legacy Creative having to pay for the costs and royalties associated with the events or the value of the intellectual property.

92. Defendants have been unjustly enriched at the expense of Catalystix in an amount to be determined at trial, exclusive of costs and interest.

**RELIEF REQUESTED**

WHEREFORE, Catalystix prays that the Court:

(a) Enter judgment in favor of Catalystix against Legacy Creative;

(b) Enter judgment in favor of Catalystix against Ms. McLean;

(c) Enter judgment awarding Catalystix actual damages;

(d) Enter judgment for additional damages incurred by Catalystix in an amount to be proven at trial;

(e) Award Catalystix interest accruing at prime rate of the largest bank in Nevada, plus 2%;

(f) Award Catalystix its attorneys' fees and costs, and all other litigation expenses; and

(g) Award such additional relief as the Court deems just and equitable.

Dated: July 1, 2021                     ARMSTRONG TEASDALE LLP

By: */s/ D. Loren Washburn*
MICHAEL GEHRET, ESQ.
Nevada Bar No. 9307
D. LOREN WASHBURN, ESQ.
Nevada Bar. No. 14297
201 South Main Street, Suite 750
Salt Lake City, UT 84111

BRANDON P. JOHANSSON, ESQ.
Nevada Bar No. 12003
3770 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169

*Attorneys for Catalystix Inc.*